IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MALLORY & EVANS CONTRACTORS AND ENGINEERS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 3:10-CV-26-WKW [WO] |
| TUSKEGEE UNIVERSITY, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mallory & Evans Contractors and Engineers, LLC ("M&E") brings this breach of contract and unjust enrichment action against Tuskegee University ("Tuskegee" or "University" or "Defendant"). (Compl. (Doc. # 1).) This cause is before the court on Defendant's Motion for Summary Judgment (Doc. # 26), which has been fully briefed and is ready for adjudication. Upon careful consideration of counsel's arguments, the relevant law, and the record as a whole, the court finds that Defendant's motion is due to be granted.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction in this case is exercised pursuant to 28 U.S.C. § 1332. The parties do not contest personal jurisdiction or venue, and there are allegations sufficient to support both.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (quoting former Fed. R. Civ. P. 56(c)).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  Fed. R. Civ. P. 56(e)(2); *Celotex Corp.*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498

2

F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

On summary judgment, the facts must be viewed in the light most favorable to the non-movant. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Hence, "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

### III.  FACTUAL AND PROCEDURAL BACKGROUND

The evidence, construed in the light most favorable to M&E, establishes the following facts:

M&E and Tuskegee University first developed a business relationship in 2008, when M&E worked as a subcontractor on a project pertaining to heating, ventilating, and air conditioning ("HVAC") and other related renovations at Tuskegee's campus in Tuskegee, Alabama.  (Def.'s Br. in Support 4 (Doc. # 26, Attach. 1).)  Apparently pleased with the work, Tuskegee discussed with M&E the potential of M&E performing further renovations on several of Tuskegee's dorms, with M&E serving as the prime contractor.  (Def.'s Br. in Support 4.)

After several rounds of negotiations, M&E submitted a letter to Tuskegee dated March 25, 2009 ("March 25th Proposal").  (Doc. # 31, Ex. 1A.)  The letter provided a "lump sum design-build proposal for the HVAC Improvements at the Russell, Banneker, Bethune, Younge, Drew Hall, Lewis Adams and Olivia Davidson Buildings located at Tuskegee University."  (March 25th Proposal, at 1.)  The letter continued by listing a more detailed scope of work for each building.  For Younge and Drew Halls specifically, the March 25th Proposal stated that "the HVAC services for both are derived from the services in the Bethune Hall Mechanical Rooms and will be affected by the changes there."  (March 25th Proposal, at 5.)  It further recited that Younge Hall and Drew Hall would receive "[m]odifications to the existing Hydronic Heating Water system" and that Drew Hall would receive "[m]odifications to the existing Domestic Hot Water Heater system."  (March 25th

4

Proposal, at 5.) The March 25th Proposal, under a separate sub-heading, also enumerated certain work that was excluded from the cost of the contract. Under this section, there was no provision which excluded from the lump sum any additional costs incurred by M&E on account of unforeseen contingencies.

The parties eventually reached an agreement based upon the March 25th Proposal. Tuskegee issued a Notice to Proceed Letter, signed by Cliff Wesson, Tuskegee's Construction Manager, and by Joseph James, Tuskegee's Purchasing Director, on April 2, 2009, and by Tim Sidwell on behalf of M&E on April 3, 2009 ("Notice to Proceed"). (Doc. # 26, Ex. 1C.) More than a month later, on May 13, 2009, Tuskegee issued Purchase Order # 9262857 ("Purchase Order"). (Doc. # 26, Ex. 3B.) Despite the unexplained interval of time between the Notice to Proceed and the Purchase Order, it is undisputed that these three documents are the constituent parts of the agreement between the parties.

The parties contemplated a fixed price contract. (Porter Dep. 109 (Doc. # 26, Ex. 5).) Important to this action, Item Six of the Purchase Order states: "Prior approval must be granted by the Purchasing Department if total exceeds amount listed." (Purchase Order.) Tuskegee maintains that the Purchasing Department may only approve an increase in the contract amount if the president of the University authorized it. (Payton Aff. 3 (Doc. # 26, Ex. 2).) The "amount listed," which is reflected in all three documents, is $3,850,535.00, and

neither party disputes that this was the original amount agreed upon.[1]  (Pl.'s Resp. 4 (Doc. # 32); Def.'s Br. in Support 6.)

Sometime in April 2009, shortly after the Notice to Proceed was signed, M&E "was directed to proceed with work in the central plant, i.e. the chilled water plant."  (Pl.'s Resp. 4.)  Mr. Sidwell testified:  "Every week as we went into the central plant, we found more and more equipment that was not operational; and as we found equipment that was not operational, Cliff Wesson asked us to fix or repair that equipment on a weekly basis." (Sidwell Dep. 133 (Doc. # 31, Ex. 2).)  M&E was also forced to make significant design changes.  In order to accommodate these changes, M&E "add[ed] necessary equipment in Drew and Younge halls."  (Pl.'s Resp. 4.)  None of these repairs or changes was included in the original scope of work set forth in the March 25th Proposal.  (Pl.'s Resp. 4.)  Rather, the repairs and changes were added by proposed change orders.[2]  The parties dispute whether the contract was effectively modified in light of these proposed change orders, all of which eventually caused the total amount of the work to exceed $3,850,535.00.

---

[1] This figure represents only the amount that Tuskegee agreed to pay M&E. The total cost of the project to Tuskegee was actually $4,570,000.  However, Tuskegee agreed to purchase certain items of equipment on M&E's behalf in order to save taxes, and deduct those purchases from the total cost. (James Dep. 86-92.)

[2] There are four proposed change orders ("PCOs") at issue.  PCO # 001 was described as "Additional work at the Main Chilled Water Plant."  PCO # 002 was to "Provide & Install Two Hot Water Heaters in Younge Hall."  PCO # 003 was to "Provide & Install Boiler, Heater & Tank in Drew Hall."  PCO # 004 involved "Decreas[ing] approach on three CHW plate & frame heat exchangers by 1 deg." ("PCO Logs" from June 3, 2009, to Sept. 9, 2009 (Doc. # 31, Ex. 1F (Pt. 1-3)); Sidwell Aff. ¶ 11 (Doc. # 31, Ex. 1).)

When a proposed change order exceeds the original contract amount at Tuskegee, there is a recognized approval process. (Porter Dep. 110-11 (Doc. # 26, Ex. 5).)  First, the proposed change order is discussed between the contractor and Mr. Wesson, in his capacity as Construction Manager. (Porter Dep. 110-11.)  Mr. Wesson then submits a "change order request" to the Purchasing Department, which makes a determination of whether there are available funds. (Porter Dep. 110-11.)  The Purchasing Director then presents the proposed change order to the budget director, who forwards it to the vice president for business and fiscal affairs, Mr. Leslie Porter, who passes it along to the President, Dr. Benjamin M. Payton. (Porter Dep. 110-11.)  In this fashion, the president reviews the proposed change order and directs the Purchasing Department to reject or approve it.  M&E does not dispute this process.

The original costs for these four proposed change orders were low enough ($205,000.00 in aggregate) that they did not result in the total contract price exceeding the amount listed in the original agreement. (PCO Log from June 3, 2009 weekly meeting.)  Any changes not affecting the total contract amount need not follow the approval procedure required by Item Six of the Purchase Order. (Porter Dep. 32-33; Wesson Dep. 506-07; James Dep. 166.)

It happened that the first estimates were far too optimistic on the low side.  As the project progressed, the parties held weekly meetings to discuss the status of the work.  Mr. Wesson represented Tuskegee during these meetings.  M&E alleges that it "was directed to proceed through Cliff Wesson," with matters relating to the project. (Pl.'s Resp. 10.)  Indeed,

during these weekly meetings, Mr. Wesson "approved" thirty-six change orders without following the approved change order process, which caused Mr. Porter to officially reprimand and suspend Mr. Wesson without pay, after the project concluded, for his "unauthorized actions."[3]  (Porter Reprimand Letter, 1 (Doc. # 31, Ex. I).)  The weekly minutes and PCO Logs from the weekly minutes show that the prices of these disputed proposed change orders increased incrementally and significantly.[4]  The PCO Log from the September 2, 2009 weekly meeting listed the aggregate price for these four proposed change orders at $583,365.00.  M&E's Pay Request # 4, dated September 2, 2009, was inflated to the sum of $765,915.00, on account of these proposed change orders, but was rejected by Tuskegee for having exceeded the contract amount without obtaining prior approval from the Purchasing Department. (Tuskegee's Rejection of Pay Request # 4 (Doc. # 26, Ex. 3I); Sidwell Aff. ¶ 12.)

Finally, it is undisputed that Tuskegee has paid the full initial amount of the contract. (M&E Pay Requests # 1-3 (Doc. # 26, Exs. 3D, 3G, 3H); Tax Packages # 1-3 (Doc. # 26, Exs. 3J, 3K, 3L).)  At issue here are the change orders.

---

[3]  However, Tuskegee minimizes the reprimand by asserting that, upon further review and upon Mr. Wesson's subsequent explanation, the University found no wrong with Mr. Wesson's actions. (Porter Dep. 137; Cliff Wesson Response to Reprimand Letter (Doc. # 33, Ex. G).)

[4]  All of M&E's weekly minutes, despite the skyrocketing figures in the work description spreadsheet, also contain this statement in the final re-calculations: "Approved Change Orders: 0."

## IV. DISCUSSION

**A.** <u>**Breach of Contract**</u>

If M&E is to prevail on its breach of express contract claim, it must show that Tuskegee obligated itself contractually to pay the extra cost for the additional work. Tuskegee argues that no such evidence exists.  Specifically, Tuskegee contends that Item Six of the Purchase Order – requiring "[p]rior approval" by the Purchasing Department if the amount exceeded $3,850,535.00 – creates a condition precedent, and that because approval from the Purchasing Department was not obtained, M&E cannot prove that Tuskegee failed to perform under the contract by not paying the extra costs.  (Def.'s Br. in Support 11-12.)

Under Alabama law, a claim for breach of contract requires a plaintiff to prove four elements:  "'(1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.'"  *Barrett v. Radjabi-Mougadam*, 39 So. 3d 95, 98 (Ala. 2009) (quoting *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009)).  A condition precedent is "a fact which must exist or occur before a duty of immediate performance of a promise arises."  *Fid. & Cas. Co. of New York v. DeLoach*, 195 So. 2d 789, 793 (Ala. 1967) (citing *Taylor v. Rhea*, Minor 414 (Ala. 1826)); *see also* Restatement (First) of Contracts § 250 (1932).  "If a fact is a condition precedent to the defendant's duty of performance, it is a necessary part of the plaintiff's cause of action."  *Barnette v. Robertson*, 20 So. 3d 798, 800 (Ala. Civ. App. 2009).  It has long been the law in Alabama, however, that a condition precedent may be waived.  *Liverpool & London & Globe Ins. Co., Limited, of England v. McCree*, 105 So. 901, 905 (Ala. 1925).

9

The court agrees with Tuskegee that Item Six of the Purchase Order creates a condition precedent, and M&E does not argue to the contrary. (Pl.'s Resp. 11 ("[a]ssuming *arguendo* that the prior approval of the Purchasing Department is a condition precedent").) Item Six undisputedly is a contractual term, and under Item Six, Tuskegee is obligated to pay costs in excess of the fixed contract price ($3,850,535.00) only where the Purchasing Department approves the excess cost. In other words, in the context of this contract, obtaining approval from the Purchasing Department is the fact that must occur before Tuskegee becomes bound to any increases in the total contract amount. (Purchase Order.) Therefore, M&E must show that this condition was satisfied or that it was waived by Tuskegee.

M&E presents no evidence that approval from the Purchasing Department was obtained, and, as Tuskegee's construction manager, M&E does not dispute that Mr. Wesson had no actual authority to approve additional funding for the project himself. As outlined above, that authority rested nominally with the Purchasing Department and ultimately with the president of the University, and in any event, not with Mr. Wesson. Recognizing as much, M&E has chosen an alternative route, asserting that Tuskegee waived the condition precedent in Item Six of the Purchase Order by clothing Mr. Wesson with the apparent authority to approve proposed change orders.

The scope of an agent's apparent authority is defined based on the principal's representations to third parties concerning the agent's authority, and the third parties' subsequent understanding of the agency relationship based upon those representations.

10

Apparent authority "rests upon the principle of estoppel, which forbids one by his acts to give another an appearance of authority which he does not have and to benefit from such misleading conduct to the detriment of one who has acted in reliance upon such appearance." *McLemore v. Hyundai Motor Mfg. Ala., LLC,* 7 So. 3d 318, 329 (Ala. 2008) (internal quotations omitted). "When one has reasonably and in good faith been led to believe . . . that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency." *Halle v. Brooks*, 96 So. 341, 342 (Ala. 1923).

The burden of proving an agency rests upon the party asserting its existence. *Johnson v. Shenandoah Life Ins. Co.*, 281 So. 2d 636, 640 (Ala. 1973). At the summary judgment stage, "a party relying on an apparent agency must 'show that he was misled by the appearances relied upon. It is not enough that he might have been . . . so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough.'" *McLemore*, 7 So. 3d at 329 (quoting *Brown v. St. Vincent's Hosp.*, 899 So. 2d 227, 241 (Ala. 2004)).

M&E has unveiled no representations attributable to Tuskegee that would create a triable issue as to whether M&E reasonably could have believed that Mr. Wesson was clothed with the authority to approve proposed change orders that exceeded the total cost of the contract. M&E says that it "was directed to proceed through Cliff Wesson." (Pl.'s Resp. 10.) That statement does not provide a hint as to who issued the directive, is conclusory, and is unaccompanied by a record citation. *See United States v. Cardona*, 302 F.3d 494, 497 (5th

Cir. 2002) ("[A]rguments in brief are not evidence"); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . , in the absence of supporting evidence, are insufficient to withstand summary judgment."). M&E also candidly points out that it dealt with Mr. Wesson on a regular basis and, thus, "worked under the *assumption* that Mr. Wesson had the authority to request these types of changes." (Porter Dep. 125-26 (emphasis added).) Absent any further factual development by M&E, the assumption is nothing more than "mere belief without cause." *Birmingham News Co. v. Birmingham Printing Co.*, 96 So. 336, 339 (Ala. 1923). An assumption is not proof of apparent authority to bind a principal. It simply does not create a genuine issue of material fact as to whether M&E had reasonable cause to believe that Mr. Wesson possessed that authority.

M&E's reliance on apparent agency is further belied by Item Six of the Purchase Order, which clearly provides that prior approval must be sought from the *Purchasing Department* if the total exceeds the contract amount. M&E's belief notwithstanding, the plain language of the contract should have alerted M&E that Mr. Wesson did not possess the authority to approve change orders that exceeded the contract amount. *Birmingham News Co.*, 96 So. at 339.

Mr. Wesson's own representations or actions that may have caused M&E to believe that he possessed such authority are irrelevant. "The apparent power of an agent is to be determined by the acts of the principal, and not by the acts of the agent." *Johnson*, 281 So. 2d at 640 (quoting Am. Jur. 2d *Agency* § 74). Even though Mr. Wesson may have

12

"approved" the proposed change orders or may have insinuated to M&E that Tuskegee endowed him with the authority to do so, M&E cannot use Mr. Wesson's actions to obligate Tuskegee on the theory of agency by apparent authority.

Also irrelevant is the fact that M&E encountered unforeseen contingencies with respect to the amount of work that needed to be done.  The contract did not give M&E a mandate to get the work done no matter the cost.  This was a fixed price contract; M&E was to perform certain work for a specified cost.  (Porter Dep. 109.)  Tuskegee was concerned about the costs associated with the project.  (Doc. # 26, Ex. 6 (Charles Etheridge Dep. 63).)  And as mentioned above, M&E did not protect itself contractually in the March 25th proposal for unforeseen contingencies.  M&E is not entitled to compensation for the additional work simply because it was done.  Rather, Tuskegee had to agree to pay M&E for it, which, on this record, did not happen.

There are no issues of material fact in dispute as to the breach of express contract claim, and on the material facts, Tuskegee is entitled to judgment as a matter of law. Summary judgment, therefore, is due to be entered in favor of Tuskegee on this claim.

**B.**     **Breach of Implied Contract**

In the alternative, M&E argues that it is entitled to compensation for the extra work based upon the theory of implied contract.  Tuskegee argues, however, that the existence of an express contract between it and M&E precludes an implied contract claim.  (Def.'s Br. in Support 14.)

"[U]nder Alabama law, claims of both an express and an implied contract on the same subject matter are generally incompatible." *Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 447 (Ala. 1996). The Alabama Supreme Court has consistently held that "where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter." *Id.* (citing *Vardaman v. Florence City Bd. of Educ.*, 544 So. 2d 962 (Ala. 1989); *Hendrix, Mohr & Yardley, Inc. v. City of Daphne*, 359 So. 2d 792 (Ala. 1978); *Robinson Lumber Co. v. Sager*, 75 So. 309 (Ala. 1917)).

The additional work for which M&E seeks payment clearly relates to the same subject matter as the original contract between the parties. Because M&E does not dispute the existence of an express contract, the original agreement, it cannot maintain its breach of implied contract claim under Alabama law.

## C.    <u>Quantum Meruit and Unjust Enrichment</u>

Finally, M&E claims that it is entitled to compensation for the extra work based on the equitable doctrines of *quantum meruit* and unjust enrichment. Tuskegee contends that these claims which are "couched within the alleged implied agreement" are inappropriate, given the existence of the parties' express agreement. (Def.'s Br. in Support 16.)

"[I]n order to succeed on a claim based on a theory of quantum meruit, the plaintiff must show that it had a reasonable expectation that there would be compensation for the services." *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345 (Ala. 1991) (citing *Burgess Mining & Constr. Corp. v. Lees*, 440 So. 2d 321 (Ala. 1983)). "[R]ecovery on a

14

[theory of] quantum meruit arises when a contract is implied; the law implies a promise on the party knowingly accepting the benefit of services provided by another to pay a reasonable value for those services." *Brannan & Guy, P.C. v. City of Montgomery*, 828 So. 2d 914, 920 (Ala. 2002) (citing *City of Daphne*, 359 So. 2d at 795; *Glenlakes Realty Co. v. Norwood*, 721 So. 2d 174 (Ala. 1998)).

M&E's quantum meruit theory founders for the same reason its implied contract claim fails. "[W]hen an express contract exists, an argument based on a quantum meruit recovery in regard to an implied contract fails." *City of Montgomery*, 828 So. 2d at 921. Because M&E does not dispute the existence of an express agreement governing the subject matter, quantum meruit is unavailable.

M&E's unjust enrichment claim is also precluded based on the existence of an express contract. Because M&E does not deny the existence of an express contract, its quasi-contractual claims for unjust enrichment cannot survive summary judgment under Alabama law. *See Taylor v. XM Satellite Radio, Inc.*, 533 F. Supp. 2d 1151, 1156 n.4 (N.D. Ala. 2007) (dismissing an unjust enrichment claim where the complaint alleged an express contract governing the parties' relationship) (citing *Vardaman*, 544 So. 2d at 965).

## V.  CONCLUSION

Accordingly, it is ORDERED as follows:

> (1)    Tuskegee's Motion for Summary Judgment on M&E's express breach of contract claim is GRANTED;

(2)     Tuskegee's Motion for Summary Judgment on M&E's implied breach of

contract claim is GRANTED; and

(3)     Tuskegee's Motion for Summary Judgment on M&E's quantum meruit and

unjust enrichment claim is GRANTED.

An appropriate judgment will be entered separately.

DONE this 10th day of December, 2010.

_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE

16