IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

MALLORY & EVANS CONTRACTORS )
AND ENGINEERS, LLC, )
 )
      Plaintiff, )
 )
  v. ) CASE NO. 3:10-CV-26-WKW [WO]
 )
TUSKEGEE UNIVERSITY, )
 )
      Defendant. )

## **MEMORANDUM OPINION AND ORDER**

On December 10, 2010, the court entered summary judgment in favor of Tuskegee University ("Tuskegee"). (Docs. # 59, 60.) Plaintiff Mallory & Evans Contractors and Engineers, LLC ("M&E"), has filed a timely Rule 59(e) Motion to Reconsider and Alter or Amend (Docs. # 61, 62), to which Tuskegee has responded (Doc. # 64). Upon consideration of counsel's arguments, the relevant law, and the record, M&E's motion is due to be denied.

## **I. LEGAL STANDARD**

A motion to alter, amend or vacate is governed by Federal Rule of Civil Procedure 59(e). "In the interests of finality and conservation of scarce judicial resources, reconsideration of a previous order is an extraordinary remedy to be employed sparingly." *United States v. Bailey*, 288 F. Supp. 2d 1261, 1267 (M.D. Fla. 2003). "The decision to alter or amend a judgment is committed to the sound discretion of the district court." *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992).

"The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)). "A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been presented prior to the entry of judgment." *Id.* (quoting *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)).

## II. DISCUSSION

M&E's Rule 59(e) motion and brief ask the court "to correct clear error and prevent manifest injustice" in the court's Memorandum Opinion and Order (Doc. # 59) granting summary judgment in favor of Tuskegee.

### A. **Implied Contract, Quantum Meruit, Unjust Enrichment**

M&E's breach of implied contract and quantum meruit or unjust enrichment arguments merely disagree with the court's conclusions of law and fact and do "nothing but ask the [court] to reexamine an unfavorable ruling." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010). M&E states that "it defies logic for the Court to reach the conclusion that [M&E]'s implied contract theory is barred under Alabama law . . . ." (Br. in Support 13.) However, M&E cites no relevant case law revealing any clear error of law. M&E cites *Kennedy v. Polar-BEK & Baker Wildwood Partnership*, 682 So. 2d 443 (Ala. 1996), for the proposition that "Alabama law permits a court to find the existence of an implied contract when the existence of an express contract on the same subject matter is not proven." (Br. in Support 14.) This proposition has no relevance to this case; an express

2

contract existed on the subject matter. (Compl. ¶ 6 (Doc. # 1) ("Plaintiff and Defendant entered into a contract known as Purchase Order # P9262857).) Because M&E has "identified no new evidence or manifest error" on the breach of implied contract and quantum meruit or unjust enrichment claims, it is "merely attempt[ing] to reargue factual issues previously decided by [this court]." *Morton v. Astrue*, 380 F. App'x 892, 895 (11th Cir. 2010). The motion is due to be denied on these grounds.

**B.** **Express Contract**

With respect to its breach of express contract claim, M&E advances three arguments.

*1.    Waiver of the Condition Precedent*

The first of these arguments, which can be dispatched easily, is that Tuskegee waived the condition precedent in Item Six of the Purchase Order. This argument is merely an attempt to "relitigate old matters" and, thus, will not be considered. *Arthur*, 500 F.3d at 1343. M&E has not demonstrated manifest error.

*2.    Ratification*

The second argument is that "Tuskegee ratified and affirmed the agreement for the [p]roposed [c]hange [o]rders made between [M&E] and Cliff Wesson." (Br. in Support 10.) This argument was not raised by M&E at summary judgment. "[Rule 59(e) motions] to amend should not be used to raise arguments which could, and should, have been made before the judgment was issued." *Lussier v. Dugger*, 904 F.2d 661, 667 (11th Cir. 1990). "Denial of a [Rule 59(e)] motion to amend is 'especially soundly exercised when the party has failed to articulate any reason for the failure to raise the issue at an earlier stage in the

3

litigation.'" *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992) (quoting *Lussier*, 904 F.2d at 667); *see also Michael Linet, Inc.*, 408 F.3d at 763 (explaining that a Rule 59(e) motion should not be used to raise arguments that could have been raised before judgment was entered). Although not obliged to, the court will address M&E's ratification argument. M&E cites *Rush v. Atomic Electric Co.*, 384 So. 2d 1067 (Ala. 1980) and *Tuskegee Institute v. May Refrigeration Co.,* 344 So. 2d 156 (Ala. 1977) to buttress its theory. Neither case is on point.

In *Rush*, the general contractor, defendant and counterclaim plaintiff, had entered into a hospital construction contract with the City of Jacksonville. The general contractor subcontracted with the plaintiff, also counterclaim defendant, to do the electrical work on the project. *Id.* Although the work was completed and accepted by the general contractor, the subcontractor was never paid the full contract price. *Id.* at 1068. The dispute centered around the fact that the subcontractor's work was completed four months late. *Id.* In a non-jury trial, the trial court awarded judgment in favor of the plaintiff subcontractor. The general contractor appealed to the Alabama Supreme Court, contending that the contract was signed by individuals acting in their individual capacities and not on behalf of either company each represented. The Alabama Supreme Court stated that "[e]ven if neither corporation was bound by the signature of its agent, which we do not believe to be true, appellant [general contractor] operated under the contract without objection until the work contracted for was performed, accepted the benefits of it, and, in fact, has counterclaimed against [the subcontractor] for breach of the very contract he claims not to be bound by." *Id.*

4

at 1068.

*Rush* is markedly different from the present case in at least two respects. The first is that the *Rush* court only considered the ratification argument in hypothetical terms. *Id.* ("Even if neither corporation was bound by the signature of its agent, which we do not believe to be true . . . ."). The second is that the contract in which ratification was an "issue" was the only contract between the two parties, and it was signed by an agent with the authority to bind the principal to the contract. Here, M&E argues that Tuskegee ratified an alleged contract price modification despite the fact that there was a clause in the contract which required prior approval for contract price modifications. To say that a party ratified a contract modification when the contract itself restricted such modification is another way of saying that the party waived the relevant clause in the contract in order to allow for the ratification. As the court has already decided, Tuskegee did not waive Item Six of the Purchase Order. (Mem. Op. 10-13. (Doc. # 59).)

In *Tuskegee Institute*, the plaintiff had entered into a written agreement with an employee of Tuskegee to install an air conditioning system. 344 So. 2d at 157. The case was submitted to the jury, which received instructions on both agency and ratification. *Id.* The jury returned a verdict for the plaintiff. On appeal, the Alabama Court of Civil Appeals reversed, citing a lack of evidence regarding agency authority. *Id.* The Alabama Supreme Court agreed with the court of civil appeals that "the evidence was insufficient to show that persons purported to act for Tuskegee had actual or apparent authority . . . ." *Id.* Nevertheless, the Alabama Supreme Court reversed the court of civil appeals on ratification

grounds. "[T]his Court [has] recognized that if a principal has knowledge of acts performed on its behalf, even though unauthorized, then the principal can ratify those acts." *Id.* at 158. Because the jury was instructed on ratification, the Alabama Supreme Court held that the evidence on ratification was sufficient to support the jury's award to the plaintiff. In a similar vein, M&E argues that, although Mr. Wesson did not have authority to bind Tuskegee to a contract price that exceeded the contract amount, Tuskegee "ha[d] knowledge of [Mr. Wesson's] [unauthorized] acts performed on its behalf." *Id.*

M&E has developed dual theories of the case based on the question of Mr. Wesson's authority. As M&E would have it, if Mr. Wesson had "authority" of some form, then he could bind Tuskegee to the contract price modifications. And if he did not have authority, then Tuskegee ratified his actions under the Alabama Supreme Court's decision in *Tuskegee Institute*.

As to its first theory, M&E points to an alleged discrepancy on the issue of Mr. Wesson's agency authority in the Memorandum Opinion and Order (Doc. # 59) and the court's Order of August 3, 2010 (Doc. # 29). M&E appears to argue that the Memorandum Opinion and Order found that Mr. Wesson acted outside the scope of his authority when M&E states that "the [c]ourt in its summary judgment ruling negates the [August 3, 2010 Order] and now holds that Wesson cannot bind Tuskegee." (Br. in Support 11.) In the August 3, 2010 Order, the court denied a motion for leave to amend the Complaint to add Mr. Wesson as a defendant. As grounds for the denial, the court quoted Tuskegee's concession, made in its opposition to the motion for leave to amend, that "'Mr. Wesson had

6

authority to act on behalf of [Tuskegee] in connection with the project'" and that "'[t]here is no contention by [Tuskegee] that Mr. Wesson acted outside the line and scope of his employment in his actions in this case.'" (Aug. 3, 2010 Order (quoting Doc. # 28, at 4-5).)

M&E's argument, although clever, is fatally flawed. The first problem concerns how M&E defines authority. The court did not find in its August 3, 2010 Order that Mr. Wesson had authority to bind Tuskegee to price modifications to a $3,850,535 fixed price contract. M&E's argument, in its purest form, is if an agent has authority for one purpose, he has authority for all purposes. Although the court bound Tuskegee to its admission that Mr. Wesson was Tuskegee's agent, there was no concession by Tuskegee that Mr. Wesson had authority to bind Tuskegee to contract price modifications. That is clear from an aggregate review of Tuskegee's opposition. (Doc. # 28.) As support for its concession that "Mr. Wesson had authority to act on behalf of [Tuskegee] in connection with the project," Tuskegee cited deposition testimony from President Payton. President Payton defined the "specific authority" that Mr. Wesson "had with respect to" the project at issue, but testified that his authority did not include "the authority to change the nature and the scope of a project." (Doc. # 28, at 5 (quoting Payton Dep. 58-59).) Indeed, the court is lost as to the point M&E is trying to make, as M&E has never disputed that Mr. Wesson did not have actual authority to approve additional funding for the project. (Mem. Op. 10.)

Because the court has found that Mr. Wesson, despite being Tuskegee's agent as the construction manager, did not have authority to bind Tuskegee to contract price modifications, M&E's belated ratification argument will now be addressed. In order to

7

create a triable issue as to whether Tuskegee ratified the price modification, M&E must present enough evidence to show a genuine issue of material fact that (1) Mr. Wesson's actions were "unauthorized," *Tuskegee Inst.*, 344 So. 2d at 158, and (2) that Tuskegee had "full knowledge of all the material facts" or means of full knowledge through "reasonable diligence." *Dusenberry v. First Nat'l Bank of Birmingham*, 122 So. 2d 716, 721 (Ala. 1959); *see also Bence v. Ala. Coal Coop.*, 681 So. 2d 130, 134 (Ala. 1996).

The first problem concerns whether Mr. Wesson's acts were, in fact, "unauthorized." *Tuskegee Inst.*, 344 So. 2d at 158. The court never found in its Memorandum Opinion and Order granting summary judgment that Mr. Wesson actually acted outside the scope of his agency authority. Referring to the undisputed fact that "Mr. Wesson did not possess the authority to approve change orders that exceeded the contract amount[,]" the court merely speculated: In the event that "Mr. Wesson *may* have 'approved' the proposed change orders or *may* have insinuated to M&E that Tuskegee endowed him with the authority to do so," those hypothetical "respresentations or actions . . . [would be] irrelevant [for the purposes of determining Mr. Wesson's apparent authority]." (Mem. Op. 12-13 (emphasis added).) In fact, the court found, as an undisputed fact, that "[a]ny changes not affecting the total contract amount need not follow the approval procedure required by Item Six of the Purchase Order." (Mem. Op. 7.)

Even if M&E could create an issue of material fact as to whether Mr. Wesson's actions were unauthorized for its ratification argument, summary judgment still would be appropriate because "[Tuskegee] did not have sufficient knowledge of [Mr. Wesson's]

8

contract [modifications] to create a jury question on the issue of ratification." *Bence*, 681 So. 2d at 134. M&E has presented no evidence that Tuskegee was in a position to know the true costs of the changes; therefore, there is no evidence that it "ha[d] knowledge of the acts performed on its behalf" to a sufficient degree to be able to "ratify those acts." *Tuskegee Inst.*, 344 So. 2d at 158. In fact, Tim Sidwell, M&E's Chief Operating Officer, stated in his affidavit that "the primary reason for the cost overrun was the additional work which was authorized by Cliff Wesson *but which had apparently not been communicated to Tuskegee's Purchasing Department, Budget Office or Senior Management*." (Sidwell Aff. ¶ 12 (Doc. # 31, Ex. 1) (emphasis added).) Furthermore, Mr. Sidwell conceded that M&E itself did not know the costs associated with the four proposed change orders as late as August 19, 2009:

> The [August 19, 2009] log indicates that there is no formal proposal submitted to the authorizing authority but that the contractor is proceeding with the work. By the status of the log, this work is proceeding, the contractor is continuing to gather the information that they need to establish its final cost and to then present a formal proposal to the customer for consideration.[1]

---

[1] In its briefing, M&E attempts to redefine the subject matter of the contract as excluding any extra work or work not originally contemplated by the parties. To do so would make change orders wholly superfluous, and would negate the clearly expressed, written term of the contract: "Prior approval must be granted by the Purchasing Department if total exceeds amount listed." (Purchase Order (Doc. # 26, Ex. 3B).) The only way the total could change would be a change in the scope of work; thus the parties anticipated such changes and provided a contractual vehicle to deal with them: prior approval by the Purchasing Department. That the total floated up and down during the project was the function of change orders. The contractor would not be at risk on the total project cost until the cumulative effect of the change orders came to rest with a total above the contract price. The significant changes in the scope of the work after the project began put M&E on notice of its risk.

It is also immaterial that the contract fails to specify which party had the burden to obtain approval from the Purchasing Department. The party seeking payment should obtain approval, and park its equipment until approval satisfactory to it is obtained. Instead, a fair reading of Mr. Sidwell's affidavit confirms that M&E did the expanded scope of work, then requested payment.

(Sidwell Aff. ¶ 11.) M&E has not yet explained how, if it did not know whether its work had exceeded the contract amount at this late date[2], there can be a genuine issue of material fact that Tuskegee would have known.

In any case, M&E did not raise the argument that Tuskegee ratified or affirmed the proposed change orders in its brief opposing summary judgment, and it has failed to explain why such arguments could not have been raised prior to entry of judgment. The ratification argument is rejected, therefore, as untimely and on the merits.

### 3.     *Triggering of Item Six of the Purchase Order*

M&E's third argument, that "a fact issue remains in this case as to whether Item Six of the Purchase Order was even triggered" (Br. in Support 7), deserves attention as the argument is likely based on an unclear and erroneous footnote in the Memorandum Opinion and Order. The incorrect statement of fact comes from footnote one of the Memorandum Opinion and Order, which states that $3,850,535 "represents only the amount that Tuskegee agreed to pay M&E. The total cost of the project to Tuskegee was actually $4,570,000. However, Tuskegee agreed to purchase certain items of equipment on M&E's behalf in order to save taxes, and deduct those purchases from the total cost." (Mem. Op. 6 n.1.) This statement is erroneous to the extent that it implies that the $3,850,535 amount was in addition to the tax savings as opposed to being inclusive of them. The undisputed evidence reveals that the $3,850,535 was inclusive of the tax credits on equipment purchases. The following

---

[2] M&E submitted its final pay request, which included the work for the four proposed change orders, on September 2, 2009. (Doc. # 26-20.)

exchange occurred during the deposition of Leslie Porter, Vice President for business and fiscal affairs at Tuskegee:

> Q: If [Mr. Wesson] had approved that pay request, do you think it appropriate for somebody acting on behalf of Tuskegee to pay a request that was approved by their eyes and ears on the project?
>     MR. GRAY: Objection –
> A: Not if it exceeded the amount of the contract –
> Q: What was the amount of the contract?
> A: Excuse me?
> Q: What was the amount –
> A: Three million eight.
> Q: Okay. Do you know how much [M&E] actually invoiced to Tuskegee?
> A: I don't.
> Q: If it was three million eight hundred and sixteen thousand, which would be less than the three million eight hundred and fifty, would that change your opinion?
> A: *Not if it did not reflect payments to their suppliers, which were part of the contract amount*.

(Porter Dep. 144 (Doc. # 26, Attach. 26) (emphasis added).) During the deposition of Joseph James, Tuskegee's Purchasing Director, he was asked, "How much was to be paid to [M&E]?" (James Dep. 88 (Doc. # 26, Attach. 24).) Mr. James responded: "*Including the equipment – Three point eight to include the equipment* that they – that was to be purchased." (James Dep. 88 (Doc. # 26, Attach. 24) (emphasis added).) Furthermore, M&E itself recognized that the $3,850,535 figure is inclusive of the tax packages on the equipment purchases when it stated the following in its brief opposing summary judgment: "This work was to be done by M&E for a total cost of $3,850,535 including tax credits, etc.[,] which would be offset against this amount." (Br. in Opposition to Summ. J. 4 (Doc. # 32).) Finally, the court impliedly corrected its error later in the opinion when it stated that "Tuskegee has

11

paid the full initial amount of the contract" and cited both the pay requests *and tax packages*. (Mem. Op. 8.)[3]

The numbers speak for themselves. M&E argues that Tuskegee has "only paid [M&E] $3,292,883.04." (Br. in Support 9.) Adding this number to the undisputed amount of the tax packages, $557,651.96 (Doc. # 26, Attachs. 20-23), results in $3,850,535.00. Therefore, the undisputed evidence reveals that any demand by M&E beyond what has already been paid or offset is in excess of the contract amount.

Although M&E's argument is meritless, the court takes the opportunity to correct footnote one of the Memorandum Opinion and Order. Footnote one should read: "The total cost of the project to Tuskegee was $4,570,000. $3,850,535 represents the total amount Tuskegee agreed to pay M&E. This figure is inclusive of certain items of equipment which Tuskegee agreed to purchase on M&E's behalf in order to save taxes, and deduct those purchases from the total amount due to M&E."

M&E's motion is due to be denied.

## III. CONCLUSION

Accordingly, it is ORDERED that M&E's Rule 59(e) Motion to Reconsider and Alter or Amend (Doc. # 61) is DENIED.

DONE this 14th day of February, 2011.

             /s/ W. Keith Watkins
            UNITED STATES DISTRICT JUDGE

---

[3] M&E appears to take advantage of the mistake in footnote one by arguing that "[t]here remains an available balance due under the contract of $557,651.96." (Br. in Support 6.)